UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROB LEAR,

                Plaintiff,

        v.

SEATTLE HOUSING AUTHORITY,
et al.,

                Defendants.

CASE NO. C13-0347JLR

ORDER GRANTING MOTIONS
FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Before the court are two motions for summary judgment:  one brought by Defendant Seattle Housing Authority ("SHA"), and another brought by Defendants Terry Nham, Martha Owens, and Jake LeBlanc.  (MSJ (Dkt. # 80); MSJ 2 (Dkt. # 82).)  This is a housing discrimination case.  Plaintiff Rob Lear has sued the Seattle Housing Authority ("SHA"), the City of Seattle, and numerous other defendants.  (*See* Am. Compl. (Dkt. # 46).)  He alleges civil conspiracy, industrial espionage, housing discrimination, and

1 many other causes of action, claiming numerous instances of harm directed at him by

2 Defendants. (*Id.* at 12-27.) Several defendants have already been dismissed from this

3 case. (*See* 10/7/13 Order (Dkt. # 60) (dismissing State of Washington); 10/25/13 Order

4 (Dkt. # 64) (dismissing City of Seattle, Mayor of Seattle, Seattle City Council, and

5 Seattle Office of Civil Rights).) Now, all but one of the remaining defendants move for

6 summary judgment. The court has considered the motions, the submissions filed in

7 support and opposition thereto, the governing law, and all of the evidence submitted by

8 Mr Lear. Considering itself fully advised, the court concludes that Mr. Lear simply has

9 not submitted evidence to create a triable issue of material fact with respect to his claims.

10 On the record before the court, no reasonable jury could find in his favor. Accordingly,

11 the court GRANTS both motions for summary judgment and ORDERS Mr. Lear to show

12 cause within 10 days why the claims against the final defendant should not be dismissed

13 as well.

14 ## II.   BACKGROUND

15      Mr. Lear has lived in housing provided by or affiliated with SHA for many years.

16 In December 2009, he moved from an apartment building known as "the Wintonia" to an

17 apartment building known as "Stewart Manor." (Means Decl. (Dkt. # 81) ¶ 4.) At

18 Stewart Manor, Mr. Lear was responsible for paying rent in the amount of $50.00 per

19 month. (*Id.*) He submitted a "Zero Income Certification" in which he certified that he

20 was receiving no income from any source. (*Id.*)

21      Mr. Lear alleges that he has been mistreated and discriminated against by SHA.

22 (*See generally* Am. Compl.) He asserts that SHA and its employees (including Ms.

Nham, Ms. Owens, and Mr. LeBlanc) have waged a campaign of harassment against him that is motivated by racial discrimination, conspiracy with his sister Brenda Tuttle, and several other factors related to Mr. Lear's past.  (*See id.*)  Principally, Mr. Lear alleges that this campaign of harassment caused him to have a heart attack and undergo heart stent implant surgery.  (*Id.* at 12-15.)  As a result, he alleges, he has been held in functional custody by SHA for the last 17 years.  (*Id.* at 1, 12-15.)

Mr. Lear advances many specific incidents of mistreatment.  For example, he claims that SHA unreasonably refused to write a letter for him that he needed in order to get charity care from Swedish Medical Center.  (*Id.* at 13-15.)  He also alleges that he was required to perform community service by SHA while other tenants were not, that SHA orchestrated a "gang attack" on him, and that he was singled out and required to pay a smoking deposit that white tenants were not required to pay (Mr. Lear is African-American).  (*Id.* at 12-15.)

For each of the individual defendants, Mr. Lear makes slightly different allegations.  With respect to Ms. Nham, he alleges:  "Terry is sadistic (she at some level enjoys torturing people).  I'm a Vietnam Era Veteran.  When I went into the service the war was over.  I was not sent to Vietnam, nor did I cross into Cambodia and burn down Terry's Village, or whatever.  She cannot be allowed to be judge, jury, and executioner, of struggling American Veterans . . . ."  (*Id.* at 17.)  With respect to Ms. Owens, Mr. Lear alleges:  "Martha is evil, sneaky, too impulsive, and inclined to jump to false conclusions *after whatever bribe she was hinting at was refused.*  Why?  Because, one of the first things she said to me was "my husband got kicked out of the service for loan sharking."

1   My antennas went up.  Sounds like MAFIA to me . . . ."  (*Id.* (emphasis in original).)

2   With respect to Mr. LeBlanc, he alleges:  "Jake, on the other hand, is not necessarily evil.

3   He is just plain stupid, a slave to the system to the extent of 'failure to take responsibility

4   for bad decisions and lack of common sense.'"  (*Id.* at 18.)

5        Mr. Lear filed this action in February 2013.  He was granted leave to proceed in

6   forma pauperis, and since then has engaged in substantial motions practice.  (*See* Dkt.)  In

7   October 2013, the court granted a motion to dismiss the State of Washington with

8   prejudice under the doctrine of Eleventh Amendment sovereign immunity (10/7/13

9   Order), and a motion to dismiss all City of Seattle-related defendants for a variety of

10  reasons (10/25/13 Order).  All of the remaining defendants except one filed for summary

11  judgment on February 11, 2014, (*see* MSJ 1; MSJ 2), and those motions are now before

12  the court.

13              **III.   ANALYSIS**

14  **A.   Summary Judgment Standard**

15       Under Federal Rule of Civil Procedure 56, "[s]ummary judgment for a defendant

16  is appropriate when the plaintiff fails to make a showing sufficient to establish the

17  existence of an element essential to that party's case, and on which that party will bear

18  the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also*

19  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing there is "no

20  genuine issue as to any material fact" and he or she is entitled to prevail as a matter of

21  law.  *Celotex*, 477 U.S. at 323.  A genuine issue exists when a rational fact finder,

22  considering the evidence currently in the record, could find in favor of the non-moving

party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is material if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its burden, the nonmoving party must go beyond the pleadings and identify facts that show a genuine dispute for trial. *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). In judging the sufficiency of the evidence, the court is required to resolve all doubts and draw all reasonable inferences in the non-moving party's favor. *Beard v. Banks*, 548 U.S. 521, 530-31 (2006). If, however, the moving party fails to carry its initial burden of production, the opposing party has no obligation to produce countervailing evidence. *Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

**B.    Mr. Lear's Evidence**

To avoid summary judgment, a party must provide evidence, going beyond the pleadings and mere assertions, demonstrating specific facts that establish a genuine issue of material fact. *See, e.g.*, *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). In other words, summary judgment is appropriate if the plaintiff fails to produce evidence suggesting he could prove the elements his claim at trial. *See id.*; *Celotex*, 477 U.S. at 322; Fed. R. Civ. P. 56(a).

Ordinarily, the plaintiff will attach any evidence relied on to oppose summary judgment to its opposition brief. Mr. Lear has not done that here. However, the court affords a certain amount of leeway to pro se litigants and construes their pleadings liberally. *See, e.g.*, *Richards v. Harper*, 864 F.2d 85, 88 (9th Cir. 1988). Further, the

1    court is aware that Mr. Lear is not familiar with the rules of evidence or many of the

2    other rules and customs that would ordinarily apply on a summary judgment motion.  As

3    such, and out of an abundance of caution, the court has examined all submissions Mr.

4    Lear has submitted throughout the course of this case and identified those that could be

5    liberally construed as evidence of Mr. Lear's claims.  Mr. Lear has submitted the

6    following evidence:

7    1.  Several letters and documents related to service of process on SHA (Dkt. # 7).

8    2.  A letter Mr. Lear wrote to the United States Department of Housing and Urban

9        Development ("HUD") in 2010 (Dkt. # 7).

10   3.  A letter from the Washington State Attorney General's Office explaining to

11       Mr. Lear that the Attorney General cannot give him legal advice (Dkt. # 7).

12   4.  Several documents related to the addresses of Defendants for purposes of the

13       U.S. Marshal effecting service (Dkt. # 11).

14   5.  A document that contains the caption in this case along with the word

15       "TIMELINES" (Dkt. # 19).

16   6.  23 pages of "INITIAL DISCLOSURES," consisting mostly of correspondence

17       between Mr. Lear and SHA officials (Dkt. # 23).  The correspondence

18       documents Mr. Lear's multitude of complaints against SHA.  These "INITIAL

19       DISCLOSURES" also include several notes from Mr. Lear's doctors, a copy of

20       a check for $64.26 made out to Kinko's Copies, and a letter written to SHA by

21       an attorney on Mr. Lear's behalf.

22

7. A memorandum setting forth what Mr. Lear believes is the law governing this case (Dkt. # 24).

8. A compact disk supposedly containing evidence of a racially-motivated hate crime on SHA property (Dkt. # 25). Mr. Lear claims that SHA did not evict the perpetrator of the hate crime, but attempted to evict the victim instead.

9. Several letters documenting Mr. Lear's prior litigation history, including a letter from HUD related to a complaint Mr. Lear filed with HUD, a Notice of Bankruptcy Case Filing, and a representation agreement from the Housing Justice Project (Dkt. # 26).

10. A "Statement of Damages First Draft" outlining what Mr. Lear believes his damages are (Dkt. # 33-1).

11. A letter from Mr. Lear to Defendant Terry Nham with a community service log attached to it wherein Mr. Lear attempts to demonstrate that he has satisfied SHA's community service requirement by spending 1200 hours on "National Debt Relief & Job Creation" (Dkt. # 35).

12. Screenshots of Mr. Lear's email inbox that he asserts demonstrate retaliation (Dkt. # 35).

13. A news article about illegal housing discrimination in Seattle (Dkt. # 35).

14. A "Sworn Statement" by Mr. Lear indicating that he "challenges the jurisdiction of the Superior Court" in this case (Dkt. # 37).

15. A statement by Mr. Lear that he has been evicted from his home and is now homeless (Dkt. # 51). Mr. Lear also asserts that SHA is responsible for ending his relationship with his fiancé and ruining his family life.

16. Documentation related to Mr. Lear's business "Doublescreen Communications Corp." including a certificate of formation, a picture of two envelopes Mr. Lear received from the White House, and a picture of a $25 check made out to "Cash" (Dkt. # 62).

17. A document providing information related to "gang stalking" (Dkt. # 63).

18. A copy of an amendment to the "Willis M. and Rosie Tuttle Family Trust" (Dkt. # 66).

19. A picture of an answering machine tape superimposed with allegations of conspiracy (Dkt. # 68-1).

20. A letter of recommendation written on Mr. Lear's behalf by a former employer, a letter from the Washington State Attorney General's Office regarding a consumer protection complaint, documentation related to the filing of a patent, copies of several letters from then-president Bill Clinton, and some papers apparently sent to Mr. Lear by the Department of Education (Dkt. # 69).

21. A "Table of Exhibits" detailing the evidence submitted by Mr. Lear (Dkt. # 70-1).

22. A statement from Mr. Lear about "Testing" evidence (Dkt. # 78).

23. 100 pages of medical records (Dkt. # 79).

24. A declaration submitted to oppose summary judgment that attempts to advance Mr. Lear's legal theories (Dkt. # 85).

25. An email from Brenda Tuttle making allegations against Mr. Lear (Dkt. # 86-1).

26. A copy of Mr. Lear's social security card (Dkt. # 86-2).

27. A declaration indicating that Samsung attempted to steal a patent belonging to Mr. Lear and that Mr. Lear was unable to complete discovery because he had pneumonia (Dkt. # 86-2).

**C.    Mr. Lear's Claims**

Problematically, the evidence listed above does not defeat summary judgment on any of Mr. Lear's claims.  This is because, too often, Mr. Lear's evidence seeks to prove some collateral matter; rarely does his evidence tend to prove any of the elements of his many claims.  The court examines each of Mr. Lear's claims in turn below.

1. Civil Conspiracy and 42 U.S.C. § 1983

Mr. Lear's first claim is for Civil Conspiracy and violation of 42 U.S.C. § 1983. In connection with this claim, Mr. Lear alleges that:

> Defendants actions occurred under color of law, and; The actions of defendants are a deprivation of a Constitutional Right or a Federal Statutory Right, and; Plaintiff has suffered damages resulting from the defendants actions, and; Defendants conspired with others, including state actors, to deprive plaintiff of life, liberty, civil rights, intellectual property, Small Business Minority Funding and product commercialization, education, income, inheritance, etc., by holding plaintiff against his will in functional custody for 17 years.  They knew or should have known.

1  (Am. Compl. ¶ 2.)  Civil conspiracy is generally not recognized in the law as a standalone

2  cause of action; there must ordinarily be an underlying tort.  *See Fox v. Bakery,*

3  *Confectionary, Tobacco Workers and Grain Millers Int'l Union*, 428 Fed. Appx. 767,

4  768 (9th Cir. 2011).  Thus, the court construes Mr. Lear's claim as one for conspiracy to

5  violate § 1983.

6       To prove a claim for violation of § 1983, a plaintiff must show that (1) he suffered

7  a violation of rights protected by the Constitution or created by federal statute; and (2)

8  that the violation was proximately caused by a person acting under color of state or

9  federal law.  *See, e.g.*, *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  A local

10  governmental entity such as SHA is not liable under § 1983 for the acts of its employees

11  unless the acts or omissions alleged to have caused the constitutional deprivation were

12  "visited" under a governmental custom or policy.  *Monell v. Dep't of Soc. Servs.*, 436

13  U.S. 658, 690-94 (1978).  Thus, to maintain a cause of action against SHA under § 1983,

14  Mr. Lear must identify a custom or policy that was the "moving force" of his alleged

15  constitutional deprivation.  *Id.* at 694-95; *Villegas v. Gilroy Garlic Festival Ass'n*, 541

16  F.3d 950, 957 (9th Cir. 2008).

17       He has not done so.  Mr. Lear has not introduced any evidence that SHA has a

18  custom or policy of harassing tenants or holding them in "functional custody."  Nor has

19  he presented sufficient evidence to conclude that SHA has a custom or policy of racial

20  discrimination or any other conduct violative of its tenants' constitutional rights.  In

21  short, he has fallen far short of meeting the standard necessary to defeat summary

22  judgment.  Based on the evidence Mr. Lear has presented, no reasonable fact finder could

ORDER- 10

1  find in his favor on his § 1983 or conspiracy claims against SHA.  *See Scott*, 550 U.S. at

2  380.

3  The same is true of his claims against individual defendants.  Mr. Lear has

4  presented barely any evidence of any kind relating to Mr. LeBlanc and Ms. Owens.

5  Certainly, he has not produced enough evidence for a jury to conclude that either of them

6  proximately caused a constitutional violation under color of state law.  *See Crumpton v.*

7  *Gates*, 947 F.2d at 1420.  Indeed, Mr. Lear does not identify what constitutional

8  violations these individuals caused, let alone what evidence supports his claims.  The

9  situation is different with respect to Ms. Nham.  Mr. Lear alleges and presents evidence

10 that Ms. Nham deprived him of a letter he needed so that he could obtain charity care

11 from Swedish Medical Center.  (*See, e.g.*, Initial Disclosures (Dkt. # 23).)  However, Mr.

12 Lear has not established that he had a constitutional or statutory right to receive such a

13 letter, or, to be more specific, to receive such a letter on the terms he demanded from Ms.

14 Nham.  Thus, no reasonable finder of fact could find in Mr. Lear's favor on his § 1983

15 claim against Ms. Nham.

16 For these reasons, the court GRANTS summary judgment to Defendants on Mr.

17 Lear's claims for civil conspiracy and violation of 42 U.S.C. § 1983.

18    2.  Industrial/Economic Espionage

19 Mr. Lear's next claim is for Industrial or Economic Espionage.  Mr. Lear alleges

20 that:

21 Defendants misused information gathered under pretext of subsidized
   housing requirements, in conjunction with third parties – some of which are
22 known to use "competitor intelligence gathering systems," for unlawful

deceptive purposes, including harassment, invasion of private affairs, oppression, economic suppression, and to get around the Economic Espionage Act of 1996 . . . .

(Am. Compl. ¶ 3.)  In essence, Mr. Lear argues that SHA gathered information from him with sinister motive using SHA procedures and then turned around and used that information to harass him.  (*See id.*)

This does not amount to a claim for economic espionage.  The statute Mr. Lear relies on, the Economic Espionage Act of 1996, criminalizes theft, copying, or purchase of trade secrets with intent or knowledge that the offense will benefit a foreign government, foreign instrumentality, or foreign agent.  *See* 18 U.S.C. § 1831.  There is no indication that this criminal statute creates a private right of action for citizens.  *See id.* But even if there was, and even assuming SHA was stealing trade secrets from Mr. Lear, Mr. Lear has presented no evidence whatsoever that SHA stole his trade secrets intending to benefit a foreign government, instrumentality, or agent.  That evidence is completely absent from the record.  Thus, it would be irrational for a jury to find in Mr. Lear's favor on this claim or, for that matter, for a judge to submit this claim to a jury.  The court GRANTS summary judgment to Defendants on the industrial/economic espionage claim.

3.  Housing Discrimination

Mr. Lear's next claim is for Housing Discrimination under the Fair Housing Act ("FHA"), Title VIII of the Civil Rights Act of 1968.  In connection with this claim, Mr. Lear alleges that:

Defendants discriminated against the plaintiff based on race, color, national origin, religion, sex, familial status, disability, military/veteran status.  No person in the United States shall, on the ground of race, color, or national

1   origin, be excluded from participation in, be denied the benefits of, or be
2   subjected to discrimination under any program or activity receiving federal
    financial assistance . . . .

3   (Am. Compl. ¶ 4.)

4       Under the FHA, it is unlawful "to discriminate in the sale or rental, or to otherwise

5   make unavailable or deny, a dwelling to any buyer" on account of race, disability, or

6   similar reason. 42 U.S.C. § 3604(f). The Act defines "discrimination" to include "a

7   refusal to make a reasonable accommodation in rules, policies, practices, or services,

8   when such accommodations may be necessary to afford such person equal opportunity to

9   use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Courts have recognized three

10  different types of FHA discrimination claims: (1) disparate treatment claims; (2)

11  disparate impact claims; and (3) claims for failure to make reasonable accommodations.

12  *See, e.g.*, *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 790 (6th Cir.

13  1996).

14      Mr. Lear has not presented enough evidence to proceed on any of these types of

15  claims. First, he cannot avoid summary judgment on a disparate treatment claim. To

16  prove a prima facie disparate treatment claim, Mr. Lear must show that (1) he is a

17  member of a protected class; (2) he requested a benefit he was qualified for or entitled to;

18  (3) he was rejected; and (4) a similarly situated party was treated differently. *Gamble v.*

19  *City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997); *Community House, Inc. v. City of*

20  *Boise*, 490 F.3d 1041, 1053 (9th Cir. 2007). Based on the evidence presently before the

21  court, no reasonable finder of fact could decide in Mr. Lear's favor on a disparate

22  treatment claim. Mr. Lear's claim could be based on his theory that he was required to

1   pay a smoking deposit that white tenants were not required to pay, but he has presented

2   no evidence whatsoever to support this theory.  His claim could be based on his theory

3   that he was required to perform community service, but he has come forth with nothing to

4   suggest that other tenants were treated differently.  Or, his claim could be based on his

5   theory that Terry Nham refused to write a letter on his behalf to Swedish hospital.  Again,

6   Mr. Lear has presented no evidence that anyone else in a similar situation was treated

7   differently.  Accordingly, he does not have a disparate treatment claim that survives

8   summary judgment.  *See Gamble*, 104 F.3d at 305; *Community House*, 490 F.3d at 1053.

9           The same is true of any disparate impact claim Mr. Lear may assert.  To prove a

10  prima facie disparate impact claim, a plaintiff must show "at least that the defendant's

11  actions had a discriminatory effect."  *The Committee Concerning Community*

12  *Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009) (quoting *Keith v.*

13  *Volpe*, 858 F.2d 467, 482 (9th Cir. 1988)).  This requires proof of (1) the occurrence of

14  certain outwardly neutral practices and (2) significant adverse or disproportionate impact

15  on persons of a particular type produced by those practices.  *Id.* (quoting *Pfaff v. U.S.*

16  *Dep't of Housing and Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996)).  Mr. Lear has not

17  produced any evidence showing that any particular "outwardly neutral practice" had a

18  "significant adverse or disproportionate impact on persons of a particular type."  *See id.*

19  He has produced evidence of various different SHA actions that he asserts are

20  discriminatory (*see* Dkt. ## 13, 23, 25), but none of them result from any one "outwardly

21  neutral practice."  Thus, even assuming the truth of Mr. Lear's claims, his evidence

22  shows only isolated incidents of discrimination as opposed to a "practice" that has a

1    significant adverse impact on a particular type of person.  In other words, Mr. Lear does

2    not have a disparate impact claim.

3            Last, Mr. Lear has no claim for failure to make reasonable accommodations.  Such

4    a claim would arise if there was "a refusal to make a reasonable accommodation in rules,

5    policies, practices, or services, when such accommodations may be necessary to afford

6    such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

7    Mr. Lear's claim in this regard is based largely on his allegation that SHA would not

8    exempt him from its community service requirement despite his medical limitations.[1]

9    But Mr. Lear has presented no evidence that he was actually required to perform

10   community service, or that he was otherwise refused a reasonable accommodation.

11   Indeed, it appears that Mr. Lear performed no community service and was eventually

12   exempted from the requirement after he began receiving disability benefits.  (Brosell

13   Decl. (Dkt. # 32) at 3-4.)  Thus, no reasonable factfinder could conclude on this record

14   that Mr. Lear was denied any accommodation necessary to the use and enjoyment of his

15   dwelling.  *See* 42 U.S.C. § 3604(f)(3)(B).

16           Accordingly, the court GRANTS summary judgment to Defendants on Mr. Lear's

17   housing discrimination claims.

18

19   _____

20        [1] Mr. Lear could also argue that SHA refused to accommodate him when Ms. Nham
     refused to write a letter documenting Mr. Lear's income.  However, Mr. Lear provides no
21   evidence that the letter "may be necessary to afford [him] equal opportunity to use and enjoy
     a dwelling."  *See* 42 U.S.C. § 3604(f)(3)(B).  Instead, Mr. Lear's evidence suggests that the
22   purpose of the letter was to obtain medical care at reduced cost rather than to allow Mr. Lear to
     use and enjoy his dwelling.

1    4. Failure to Make Reasonable Accommodations

2        Mr. Lear's next claim is for Failure to Make Reasonable Accommodations as

3    required by the Americans with Disabilities Act ("ADA").  In connection with this claim,

4    he alleges that:

5        Landlords must accommodate the needs of disabled tenants, within reason,
         at the landlord's own expense (42 U.S.C. SS 3604)(f)(3)(B).  A disabled
6        tenant may expect a landlord to *reasonably adjust rules, procedures,
         policies, or services* in order to give equal opportunity to use and enjoy the
7        dwelling, unit, or a common space. *Defendants failed to do so . . . .*

8    (Am. Compl. ¶ 5 (emphasis in original).)  Mr. Lear's claim appears to be based on the

9    fact that he was not exempted from SHA's community service requirement until after he

10   could prove he had a disability.

11       Under Title II of the ADA, public entities may not discriminate against individuals

12   with disabilities.  A "qualified individual with a disability" has the right not to be

13   excluded from participation in the services, programs, or activities of a public entity

14   because of disability, denied benefits based on disability, or subjected to discrimination

15   based on disability.  42 U.S.C. § 12132.  To prove a claim under Title II of the ADA, a

16   plaintiff must show:  (1) he is an individual with a disability; (2) he is otherwise qualified

17   to participate in or receive the benefit of a public entity's services, programs, or activities;

18   (3) he was either excluded from participation in or denied the benefits of the public

19   entity's services, programs, or activities or was otherwise discriminated against by the

20   public entity; and (4) the exclusion, denial, or discrimination was by reason of his

21   disability.  *See O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007).

22

1    Mr. Lear fails on elements (3) and (4).  As discussed above, he has produced no

2    evidence that he was denied any benefits or excluded from participating in SHA housing.

3    Indeed, it appears that Mr. Lear performed no community service and was eventually

4    exempted from the requirement after he began receiving disability benefits.  (Brosell

5    Decl. at 3-4.)  Further, Mr. Lear's evidence (consisting primarily of emails from himself

6    to Ms. Nham), does not approach the threshold that would allow the court to conclude,

7    even on summary judgment, that the alleged denial of benefits came about because of Mr.

8    Lear's disability.  Accordingly, the court GRANTS summary judgment to Defendants on

9    Mr. Lear's ADA claim.

10       5.  Public Nuisance

11    Mr. Lear's next claim is for Public Nuisance.  In connection with this claim, he

12    alleges that:

13    > Defendant is a public nuisance.  They knew or should have known.
     > Pursuant to Federal Common Law, public nuisance laws have no statute of
14   > limitations.  WHEREFORE, defendants and others conspired to change the
     > Public Nuisance laws "under color" around the time they transferred me to
15   > Stewart Manor.  Who are the others?  The Mayor and the Seattle City
     > Council.  The Mayor appoints the Board of Commissioners for SHA, and
16   > the City Council writes the Housing Policies.

17   (Am. Compl ¶ 6.)

18    In Washington, public nuisance claims are governed by statute.  *See, e.g.*, *Asche v.*

19   *Bloomquist*, 133 P.3d 475, 482 (Wash. Ct. App. 2006).  A nuisance is defined as an

20   "unlawful act" that "either annoys, injures or endangers the comfort, repose, health or

21   safety of others, offends decency . . . or in any way renders other persons insecure in life,

22   or in the use of property."  RCW 7.48.120.  Further, "[a] public nuisance is one which

ORDER- 17

1  affects equally the rights of an entire community or neighborhood, although the extent of

2  the damage may be unequal." RCW 7.48.130. For example, it is a public nuisance "[t]o

3  cause or suffer the carcass of any animal or any offal, filth, or noisome substance to be

4  collected, deposited, or to remain in place to the prejudice of others," or "[t]o carry on the

5  business of manufacturing gun powder, nitroglycerine, or other highly explosive

6  substance, or mixing or grinding the materials therefor, in any building within fifty rods

7  of any valuable building erected at the time such business may be commenced." RCW

8  7.48.140.

9        Mr. Lear has not presented enough evidence to defeat summary judgment on his

10  public nuisance claim. He has presented nothing to demonstrate that SHA's alleged

11  conduct "affects equally the rights of an entire community or neighborhood." *See* RCW

12  7.48.130. Rather, the vast majority of the conduct Mr. Lear alleges appears to impact

13  only Mr. Lear. For example, he alleges that SHA orchestrated a "gang attack" on him by

14  a local street gang, and that SHA required him to pay a "smoking deposit" and perform

15  community service. (Am. Compl. at 12-15.) None of these constitute conduct that

16  affects the community at large. The court therefore GRANTS summary judgment to

17  Defendants on Mr. Lear's public nuisance claim.

18        6.  Illuminati

19        Next, Mr. Lear makes several allegations related to a secret society known as "The

20  Illuminati." The Illuminati are a group that is often alleged to conspire to control world

21  affairs by masterminding events and planting agents in governments and corporations to

22

1    establish a "New World Order." *See, e.g.*, *United States v. Stone*, 279 F.R.D. 434, 436-37

2    (E.D. Mich. 2012) (discussing "the Illuminati"). Mr. Lear alleges that:

3           I suspect and believe that some employees of defendants are in some way
            connected to the group known as the [I]lluminati, which has attempted to
4           recruit me, and at least one other tenant residing in this building. I refused
            to join on the grounds of Freedom of Religion . . . .
5
     (Am. Compl. ¶ 7.)
6
            This does not state a cause of action. Even if it did, Mr. Lear presents absolutely
7
     no evidence that any SHA employees are part of the Illuminati or that he somehow
8
     suffered damages as a result of this. The court GRANTS summary judgment to
9
     Defendants on this claim.
10
            7.   Abuse of Process
11
            Next, Mr. Lear asserts a claim for abuse of process. In connection with this claim,
12
     he alleges that:
13
            Defendant engaged in Abuse of Process, harassment, and unlawful
14          behaviors (reflected in the Timeline) document of events, emails, paper
            trail, and assorted exhibits, which contributed substantially to my injuries,
15          and if unchecked, likely would have resulted in death, or Negligent
            Homicide. Defendants were trying to force me to do community service,
16          while at the same time excessively scrutinizing The investigation resulted
            in false information obtained from a tainted source in Los Angeles (Brenda
17          Tuttle)—substantially contributing to a family feud, threats, blackmail, and
            every manner of evil.
18
     (Am. Compl. ¶ 8.)
19
            Mr. Lear has not presented enough evidence to avoid summary judgment on his
20
     abuse of process claim. To prove a claim for abuse of process, a plaintiff must
21
     demonstrate that: (1) the defendant had an ulterior purpose to accomplish an object not
22

ORDER- 19

within the proper scope of the process; and (2) the defendant performed an act in the use of legal process not proper in the regular prosecution of proceedings. *Batten v. Abrams*, 626 P.2d 984, 988 (Wash. Ct. App. 1981). Mr. Lear fails on element (2). He has presented no evidence that SHA or any other defendant used any legal process in connection with the harassment he alleges. Since there is no evidence tending to prove this element, no reasonable jury could find in Mr. Lear's favor on an abuse of process claim and the court accordingly GRANTS summary judgment to Defendants on this claim.

### 8. Retaliation

Mr. Lear's next claim is for Retaliation. Mr. Lear alleges that:

Defendants interfered with plaintiff in the exercise of Constitutional Rights, Privileges, and Immunities—and RETALIATED perpetually for the exercise thereof. After plaintiff filed Fair Housing Complaints. One example being that Terry Nham created a special form specifically directed at the plaintiff as follows;

Said form asked:
(1) How do you get on the internet, and;
(2) How much do you pay for movies, and;
(3) How many vacations do you take per year?
    *A snitch told Terry I had a lot of movies, and internet access, etc.*

*As soon as Terry discovered that I was using an unsecured wifi signal she had a team come in and cut of signal. We were having a conflict, because I was exercising my rights, including the right to secure a "reasonable accommodation letter" for the purpose of securing medical attention. I have a right to "bodily integrity . . . ."*

(Am. Compl. ¶ 9 (emphasis in original).) Mr. Lear's retaliation theory is based on the notion that SHA and its employees have a vendetta against him either because they are

1   conspiring with his sister, because they are conspiring with government entities to

2   deprive him of a patent, or because he filed FHA complaints.  (*See id.* at 12-15.)

3        There is no non-speculative evidence to suggest that any retaliatory acts ever

4   occurred.  Mr. Lear believes SHA orchestrated a "gang attack" on him by a local street

5   gang, but his evidence consists of nothing more than his own say-so.  Self-serving

6   testimony, without more, is insufficient to defeat summary judgment.  *See Head v.*

7   *Glacier Nw. Inc.*, 413 F.3d 1053, 1059 (9th Cir. 2005).  There is also no evidence that

8   any of the other alleged acts—i.e., refusal to write a letter, requiring Mr. Lear to pay a

9   smoking deposit, etc.—were retaliatory in nature or were undertaken for purposes of

10  getting back at Mr. Lear for filing FHA complaints or asserting his rights under the ADA.

11  Any such conclusion on the court's part would be pure speculation.  "Mere allegation and

12  speculation do not create a factual dispute for purposes of summary judgment."  *See*

13  *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).  The court GRANTS

14  summary judgment to Defendants on Mr. Lear's retaliation claim.

15        9.  Source of Income Discrimination

16        Next, Mr. Lear brings a claim for "Source of Income Discrimination."  (Am.

17  Compl ¶ 10.)  It is unclear exactly what his allegations are with respect to this claim.  In

18  his complaint, he lists his sources of income, which include unemployment, "educational

19  funding," "CEO of Doublescreen Communications Corporation," and several others.

20  (*Id.*)  He then states that "Therefore, verification need only consist of looking on

21  Craigslist under the category of Etc. Rather than demanding something in writing from

22  participating firms . . . ."  (*Id.*)  He goes on to explain how he has suffered damages in the

1    form of "the loss of a federal grant for minority small business through the SBIR

2    Program at the Department of Education."  (*Id.*)

3          Problematically, Mr. Lear provides no legal authority to support his claim.  In

4    some jurisdictions, a claim for "source of income discrimination" may exist if a landlord

5    refuses to offer housing to a person based on the source of their income.  *See, e.g.*, *L.C. v.*

6    *LeFrak Org., Inc.*, --- F. Supp. ----, 2013 WL 6569868, at *9-10 (S.D.N.Y. December 13,

7    2013) (finding that such a claim exists under New York law).  For example, a landlord

8    might be liable for refusing to rent to prospective tenants solely because they receive low-

9    income housing vouchers.  *See id.*  However, federal law does not create a claim for

10   source of income discrimination, *see Nesbitt v. Draper & Kramer, Inc.*, No. 08 C 2684,

11   2008 WL 4542942, at *3 (N.D. Ill. May 23, 2008), and Mr. Lear presents no authority

12   that such a claim arises either under Washington, King County or Seattle statute or

13   ordinance.  The court has found no such authority.  It appears Mr. Lear has asserted a

14   cause of action that does not exist in this jurisdiction.  Accordingly, the court GRANTS

15   summary judgment to Defendants on this claim.

16        10. Policy Reversal

17        Mr. Lear next asserts that Defendants are liable for "policy reversal."  (Am.

18   Compl. ¶ 11.)  Specifically, he alleges that:

19        Because the defendants knew that the policy against doing business from a
          low income unit was aimed primarily at the plaintiff, and there was too
20        much heat, in or around November 2012, defendant tried to modify, or
          remove said missile by creating a "home based business policy."  Too little
21        too late.  I had a license to do business in 1996, a U.B.I. number, and so
          forth.  Moreover, I was doing business through the White House and Dept.
22        of Ed in Washington D.C.  Not in my unit . . . ."

1   (*Id.*)  Mr. Lear does not identify any specific cause of action he wishes to pursue in

2   connection with these allegations.  "Policy reversal" is not a cause of action.  The court

3   therefore GRANTS summary judgment to Defendants with respect to this claim.

4          11.  Dormant Commerce

5          Mr. Lear next alleges a claim for "Dormant Commerce."  Specifically, he alleges

6   that:

7          Dormant Commerce is also actionable in Title 42 § 1983 litigation.   I
           happen to have a massive amount of dormant commerce.  I estimate my
8          losses in the trillions, or billions.  But, I have mitigated damages down to
           17 million.  A mere fraction of the actual losses.

9
           And, because my injuries are peculiar to those similarly situated, I
10         incorporate the Public Nuisance laws into my complaint.  It appears that
           both statutes work pretty much the same way, in that both address the issue
11         of "intertwined relationships" and conspiracy.

12   (Am. Compl. at 27.)

13         The so-called "dormant Commerce Clause" of the United States Constitution

14   limits states' ability to regulate interstate commerce.  The Commerce Clause provides

15   that "[t]he Congress shall have Power . . . [t]o regulate Commerce . . . among the several

16   States."  U.S. Const. Art. I, § 8, cl. 3.  The Commerce Clause as written is an affirmative

17   grant of power to Congress to regulate interstate commerce, but courts have long inferred

18   from it a prohibition on state action limiting interstate commerce.  *Or. Waste Sys., Inc. v.*

19   *Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994).  The "central rationale" behind this

20   inference is that states should be prohibited from enacting laws whose object is local

21   economic protectionism.  *LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009);

22   *S.D. Myers, Inc. v. City & Cnty. of S.F.*, 253 F.3d 461, 466 (9th Cir. 2001).

ORDER- 23

Mr. Lear has not come close to making a viable dormant commerce clause claim under § 1983.  To determine whether the dormant Commerce Clause applies, the court must determine if (1) the law or ordinance "regulate[s] an activity that 'has a substantial effect on interstate commerce such that Congress could regulate the activity,'" and (2) whether the challenged ordinance discriminates against out-of-state entities. *LensCrafters*, 567 F.3d at 524 (quoting *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 993 (9th Cir. 2002)).  Mr. Lear has provided no evidence, authority, or anything else to suggest that any statute, ordinance, or governmental action in this case has a substantial effect on interstate commerce or discriminates against out-of-state entities. Indeed, he does not even identify what statute or ordinance he is challenging, if any.  The court GRANTS summary judgment to Defendants on this claim.

### 12. The Privacy Act of 1974

Next, Mr. Lear alleges a cause of action for violation of the Privacy Act of 1974, 5 U.S.C. § 552a.  His claim is based on a theory that Jake LeBlanc forged his signature in order to obtain information from the Social Security Administration:

> *Jake needed my written consent to obtain Social Security information.  I did not sign a new lease - give my consent - or otherwise authorize him to access my Social Security Administration information.  How did he get it? He FORGED it.*

(Am. Compl. at 34 (emphasis in original).)  He also alleges that SHA broke into his apartment.  (*Id.*)  Mr. Lear presents no legal authority for the proposition that the Privacy Act of 1974 provides him with a private right of action against a local government housing authority.  Indeed, the Privacy Act of 1974 governs maintenance of records by

1    federal agencies.  *See* 5 U.S.C. § 552a.  And while the Act does authorize civil actions

2    against federal agencies that violate its provisions, *see id.* § 552a(g), the federal agency

3    against which Mr. Lear levels his accusations, the Social Security Administration, is not a

4    party to this action.  In any event, Mr. Lear presents only allegation and speculation to

5    show that a forgery and break-in occurred, which is insufficient to overcome summary

6    judgment.  *See Nelson*, 83 F.3d at 1081-82.  The court GRANTS summary judgment to

7    Defendants on this claim.

8           13. Gross Negligence

9           Last, Mr. Lear nominally asserts a claim for "Gross Negligence."  In connection

10   with this claim, he alleges that:

11          SHA cannot under any circumstances ignore a hand-written letter from Dr.
            Ghods at Swedish Hospital.  Housing property managers are not qualified
12          to make medical decisions based upon their own needs, monetary interests,
            policies, hidden agendas, or even in the normal course of their duties.  It
13          cannot be argued.   Reasonable requests for accommodation were
            knowingly and willfully denied.  Repeatedly.  Regardless of who requested
14          them, or how they were requested.  They tried to get away with murder.

15   (Am. Compl. at 35.)  This is not a negligence claim, as Mr. Lear labels it, but a claim for

16   reasonable accommodation.  As the court explained above, Mr. Lear has not presented

17   sufficient evidence to survive summary judgment on his claims for reasonable

18   accommodation under either the FHA or the ADA.  The court GRANTS summary

19   judgment to Defendants on this claim.

20                        **IV.    CONCLUSION**

21          The court GRANTS the motions for summary judgment brought by SHA, Ms.

22   Nham, Ms. Owens, and Mr. LeBlanc for the reasons stated above (Dkt. ## 80, 82).  For

ORDER- 25

1  the same reasons, and because the court has granted summary judgment with respect to

2  Mr. Lear's claims, the court DENIES Mr. Lear's pending cross-motion for summary

3  judgment (Dkt. # 94) which, in any event, raises no new or material arguments, is Mr.

4  Lear's fifth filing titled as a summary judgment motion, and comes after the deadline for

5  filing dispositive motions (*see* Dkt. # 28).  Only one defendant arguably remains in this

6  case:  the SHA Board of Commissioners.  There appear to be no valid claims (and indeed

7  no claims of any kind) made against this entity, so the court ORDERS Mr. Lear to show

8  cause within 10 days why the SHA Board of Commissioners is not also entitled to

9  summary judgment dismissal of any claims against it.

10          Dated this 17th day of March, 2014.

11

12

13  _____

14  JAMES L. ROBART
    United States District Judge

15

16

17

18

19

20

21

22

ORDER- 26